UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LIVINGSTON CHRISTIAN SCHOOLS,
a Michigan nonprofit corporation,

          Plaintiff,

                                   CASE NO. 15-CV-12793

     v.                        HONORABLE GEORGE CARAM STEEH

GENOA CHARTER TOWNSHIP, a
Michigan municipal corporation,

          Defendant.

_____/

**OPINION AND ORDER DENYING PLAINTIFF'S EMERGENCY
MOTION FOR TEMPORARY RESTRAINING ORDER (Doc. #4)**

Livingston Christian Schools ("LCS" or "plaintiff") operates a pre-kindergarten through 12th grade Christian school open to the Livingston County community.  For the past nine years, LCS has operated the school in Pinckney in southern Livingston County in a building it owns.  However, LCS seeks to move the school from Pinckney to Genoa Charter Township (the "township" or "defendant") on property owned by the Brighton Church of the Nazarene (the "Nazarene Church" or the "church") before the 2015-16 school year set to begin on September 8, 2015.   To facilitate the move, non-party Nazarene Church, which operates under an existing special use permit most recently approved by the township in 2013, submitted an application to amend its special use permit to allow LCS to operate a school on the property.  Through a 4-3 vote, the township's board of trustees denied the church's application to amend the special use permit, despite the township planning commission's recommendation that the board grant the motion.  This lawsuit

-1-

followed alleging a violation of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc *et seq.*

Now before the court is plaintiff's emergency motion for a temporary restraining order ("TRO")/preliminary injunction. (Doc. #4). The township opposes the motion. The court held a hearing on Monday, August 31, 2015, to address the parties' arguments. Plaintiff's request for a TRO was denied on the record. In addition to the reasons stated on the record, this opinion and order explains the court's rationale in more detail.

## I. BACKGROUND

The Nazarene Church sits on approximately 16.5 acres (37,620 square feet) of property in Genoa Charter Township and includes a Christian education center, a sanctuary, church offices, a recreational facility and a residential parsonage. (Doc. #4 at 14). The church is bounded to the west by another church, to the east and south by public roads and to the north by neighborhoods. The church conducts "its worship services and ministries . . . on weekends and select weeknights, and approximately 1,000 people typically attend weekend worship services." (*Id.* at 15). The church property is located in the township's "suburban residential zoning district." (Doc. #11 at 8). As such, in 1991, the church obtained a special use permit allowing it to conduct its worship services and ministries on the property. (*Id.* at 12). Nine years later, in 2000, the church applied for — and was granted — a special use permit to add a 6,960 square foot "activity building addition" for kids "skate boarding and in-line skating." (Doc. #11-4 at 2, 6).

The planning commission's meeting minutes reflect that, through the years, neighbors have complained about the church. In 2003, when the church sought to add a 17,600 square foot sanctuary to its existing facility, multiple neighbors complained about

the church's existing activities. (Doc. #11-5 at 11). Neighbors complained that the children who used the skate park loitered and trashed the area, and that the church had turned the skate park and its activity center into a commercial use that was inconsistent with its special use permit and the zoning ordinance. (*Id.*). Moreover, complaints were made about the church's failure to enforce curfew restrictions allowing children at the skate park at "all times of the day and night." (*Id.*).

In 2007, the homeowners of Worden Lake Woods Subdivision, a subdivision neighboring the church, wrote a letter to the township complaining about activities going on at the church. (Doc. #11-7). The neighbors complained that, "[o]n most occasions, there is no supervision at all and the skating/biking goes on well past the 10 p.m. curfew." (*Id.* at 1). In addition, the neighbors informed the township that the church "created a situation in which there is under-age drinking, loud and disturbing music, loud cars and motorcycles often driving recklessly and the attendees spend much of their time loitering on the Worden Lake Woods property, resulting in littering and most recently, attempts at breaking into vehicles parked on Aljoann Road." (*Id.*). Because of the "lack of supervision and care" at the church, the neighbors expressed worry "about the safety of our families and property." (*Id.* at 2). The neighbors requested "action from the Township be both prompt and appropriate. . . ." (*Id.*).

In 2013, the church again applied for a special use permit for a proposed 16,120 square foot gymnasium and classroom addition. (Doc. #11-8). The church was asked by a chairperson on the planning committee whether the church was planning for a private school. A church representative responded that "the classrooms are only for Sunday school classes and no schools or day care are planned." (*Id.* at 2). At a July 22, 2013

planning committee meeting, neighbors voiced concern that the church's landscaping was inadequate and not adequately maintained.  (*Id.* at 3).  Moreover, neighbors complained that the intersection leaving the church "is so crazy with the school,[1] the church, and Pine Creek traffic plus there is no pedestrian signal.  It is very dangerous."  (*Id.*).  One neighbor complained about "kids drag racing in the parking lot at night" and people using the parking lot "as a motorcycle testing and truck testing," in addition to "music blar[ing] at night."  (*Id.* at 4).  The same concerns were raised in an August 25, 2013 letter sent to the planning commission from a neighbor in Worden Lake Woods.  (Doc. #11-10).

Despite the concerns from the church's neighbors, all of the church's special use permit applications through 2013 have been recommended for approval by the planning commission, and have been approved by the township board of trustees with certain conditions to address neighbors' concerns.

Recently, LCS sought to relocate from Pinckney, Michigan to the church's building to operate a Christian school.  LCS is a non-profit organization that has been operating a pre-kindergarten through 12th grade Christian school since its formation in 2005.  (Doc. #4-2 at 2).  For the past nine years, LCS operated the school at a building it owns in Pinckney, Michigan.  (*Id.*).  According to the declaration of LCS's treasurer, Scott Panning, "the growing enrollment of Livingston Christian Schools and the ability to meet the academic objectives of its faith-based curriculum necessitated a space larger than the Pinckney Property."  (*Id.*).  Panning also contends that LCS's "religious mission of operating a Christian school to serve the entire Livingston County community necessitated a move from

---

[1] Across the street from the church is Brighton High School.

the Pinckney Property (located in southern Livingston County) to a facility more centrally located in Livingston County." (*Id.* at 3). However, the township points to the statement of Ted Nast, an LCS administrator, that the move was necessary to help LCS "grow exponentially," and that the "deficit to being in Pinckney is that you are limited by the number of roads that can get to the location." (Doc. #12-1). Moreover, despite LCS's contention that its enrollment has been growing necessitating a move to a bigger building, the school held a meeting with parents to announce the move and informed the parents that "three consecutive years of decreasing enrollment and building deterioration such as the need for a new roof and boilers on the horizon, has ultimately led us to determine that a different location is required." (Doc. #13-4).

To facilitate the move to a new building, LCS entered into a five-year lease agreement with the Nazarene Church beginning June 1, 2015. (*Id.*). LCS believed this would give it sufficient time to "prepare the classrooms and facilities for the planned start of the 2015-2016 school year on September 8, 2015." (*Id.*). LCS prepaid rent to the church in the amount of approximately $70,000. (*Id.*). After opening enrollment to the community, with the help of LCS's social media campaign, LCS's enrollment increased by over 20% from 139 students during the 2014-2015 school year to 168 students for the upcoming 2015-16 school year. (*Id.*); *see* (Doc. #11 at 20–21).

In anticipation of the move to the Nazarene Church, LCS agreed to lease the property it owns in Pinckney to a charter school, Light of the World Academy, for $5,000 per month. (*Id.* at 4). The lease is contingent on LCS's relocation to the Nazarene Church. (*Id.*).

The township heard "through the grapevine" about LCS's anticipated relocation to the Nazarene Church beginning with the 2015-16 school year.  (Doc. #11 at 22).  The township thus advised the church that it would need to apply for a special use permit to allow LCS to operate a school on the church's property.  (*Id.*).

In March 2015, the church applied for an amendment to the existing special use permit it was issued in 2013 and submitted an impact assessment in support of the amendment.  (Doc. #4-5); (Doc. #12-3).  The impact assessment was prepared by Boss Engineering Company ("Boss").  (Doc. #12-3).  The assessment noted that "the School will add an increase of approximately 50 cars using the exiting parking facilities on Monday thru Friday."  (*Id.* at 3).  In addition, the existing playground would be used by the school Monday-Friday during the mid-day, and the parking lot, on occasion, would be used for daytime activities.  (*Id.*).  As it relates to the amount of additional people, the assessment notes that the school would increase the number of employees by approximately 25 people and there would be 150-250 students.  (*Id.* at 4).  Finally, as it relates to traffic, the assessment states:

> *-The existing Brighton High School, to the east, starts at 7:35 am and ends at 2:35 pm.  The existing Maltby School, to the west, starts at 8:30 am and ends at 3:31 pm.*
> *-The Livingston Christian School will start/end at a median time between Brighton High School and Malty [sic] Middle School times.*
>
> *- The Christian School is expected to generate 75 ingress/egress trips from the west and 50 ingress/egress trips from the east prior/after these start times.  (Survey of current school staff and students) Little of this traffic will occur during "peak" traffic hours.*
> *-The Livingston County Road Commission (LCRC) reviewed the potential traffic impact of these start/end times at the Nazarene Church facility, in a meeting on 3/17/2015, and have determined that the traffic at the Brighton Road and the Church driveway intersection is defined as "Minor Impact" (per LCRC data, see Attachment B)*

-6-

> *-Livingston Christian School will <u>not</u> operate during the "peak hour" morning nor afternoon.*
> *-A traffic count and traffic model of the Nazarene Church entrance was made by the LCRC in 2010. (see Attachment C)*

(*Id.* at 5).

Four planning commission meetings open to the public's comment took place between April and July 2015 to determine whether to recommend approval to the township board of the church's application to amend its existing special use permit. Over this four-month period, the church worked with the planning commission and others to address all outstanding issues and arrange for the operation of LCS beginning in the 2015-16 school year. Multiple issues were raised by township residents at the public meetings.

Initially, on March 30, 2015, the Brighton Area Fire Authority informed the church that its 2013 expansion did not meet fire code specifications and instructed the church on what it needed to do to bring the building up to specification. (Doc. #12-4). On March 31, 2015, the planning commission's planning and zoning consultant, LSL Planning, provided the planning commission with comments after reviewing the application to amend its special use permit. (Doc. #12-5). LSL Planning suggested that the church "must address whether the issues raised during the 2013 project review have been resolved and whether the requirements attached to that approval have been met." (*Id.* at 1). From a zoning perspective, LSL Planning stated that "[t]here are concerns of traffic generation and protection of the adjacent neighborhood to the east. We believe a traffic impact study is necessary to ensure there are no issues with the roadway[.]" (*Id.*). Likewise, the township's engineering consultant, Tetra Tech, also recommended that the township require the church to submit a traffic study. (Doc. #12-6). Tetra Tech stated that the "biggest concern

is the traffic generated by a school use and its coordination with the other public school traffic utilizing Brighton Road." (*Id.*).

At each planning commission meeting, nearby neighbors of the church complained about multiple issues, the central theme being that allowing LCS to operate a school at the church would be bad for traffic in the area, and that the church was not in compliance with conditions of its existing special use permit. The planning commission board shared the same concerns as neighbors. For example, at the first public meeting, neighbors complained that the church was still running a driver's training program in its parking lot, had not incorporated changes required as a condition of its 2013 special use permit, and that traffic would be a concern. (Doc. #12 at 11). One neighbor expressed concern that "[t]he school might cause a 25% increase in traffic flow. Cars are going in and coming out. There will be a lot of wear and tear on that road. The traffic signal is difficult. Staggering is a great plan. But there will never be a dead zone so that they can get out of their neighborhood." (*Id.*). Another neighbor said she saw a driver hit a bicyclist and is afraid someone will get hurt if traffic increases. (*Id.* at 12). One neighbor stated that "traffic is horrid." (*Id.*). These concerns continued at subsequent meetings. Some of the relevant comments made by neighbors at these meetings include:

- the church has not replaced dead trees it was supposed to replace (Doc. #12-8 at 4)

- "The security guard at the skate park is not doing what should be done because the kids are racing and speeding through the skate park," and "[t]he police will not respond to the calls because it is private property." (*Id.*).

- driver testing is still taking place (*Id.*).

-8-

• concern over traffic being "so bad" including "the increased traffic on Brighton Road and possible cut-through traffic in [the] subdivision[s]." (*Id.*); (Doc. #13-1 at 2–3)[2]

Attempting to rectify the issues raised in the public hearings, LCS hired Boss Engineering to conduct a traffic impact study. Boss provided a report on May 1, 2015, which was amended on May 20 and June 23, 2015, after receiving comments from Tetra Tech and the planning commission. (Doc. #4-6); (Doc. #12-7). The final conclusions and recommendations by Boss were as follows:

• The Livingston Christian School will have minimal impact on Brighton Road in the a.m. and p.m. peak traffic hours for the school. The Brighton Road Level of Service will remain at A.

• The Livingston Christian School will have no impact on the traffic signals located at Brighton High School based on the Livingston County Road Commission Synchro model and Bauer Road based on the distance from the Livingston Christian School to the intersection.

• There will be a significant impact on the Monday through Friday use of the Church parking lot during the September to June time period when the school is in session.

• Information shall be provided to students, parents and staff during orientation that recommends right turns out of the parking lot after drop off and pick up to limit delays within the parking lot. The Traffic Control Director will direct left turn drivers into the left turn lane of the driveway at their discretion. The Traffic Director Roles and Responsibilities are defined in Appendix D. The traffic pick up and drop off Parent and Student Orientation Material is presented in Appendix E.

• Due to potentially long delays within the parking lot and at the driveway exit to Brighton Road school staff must be posted at critical locations to monitor the delays and to direct left turns out of the parking lot.

---

[2] The planning commission also received letters from neighbors expressing concern over traffic and the church's historical non-compliance with its existing special use permit. (Doc. #13-2 at 1–45).

(Doc. #4-6 at 6).  LSL Planning deferred to Tetra Tech for comment on the traffic study. (Doc. #4-7 at 2).

After receiving the final amended report from Boss, Tetra Tech stated that it had "no further objections to approval of the site plan for approval contingent on [multiple] comments. . . ."  (Doc. #4-8 at 3).  These comments included that:

> The petitioner should add additional traffic management provisions for keeping vehicles in the proposed 24-foot-wide space for stacking in order to maintain effective circulation.  It is also a concern that the entire zone does not have a continuous sidewalk to accommodate the students.  Again, temporary measures will need to be made to separate the students waiting for parent pick up from the parking lot traffic.
>
> It is imperative that the school provide proper instruction to the traffic management volunteer to keep flow of traffic on site moving according to the plan presented.  At this time, we do not see an impact to Brighton Road as long as parents are directed to either a traffic queue or one of the many on-site parking spots.

(*Id.* at 2).

At the final planning commission meeting on July, 13, 2015, the commission recommended to the township board to approve the church's application for an amendment to its special use permit.  (Doc. #13-3 at 3).  On July 16, 2015, the assistant township manager, Kelly VanMarter, sent the township board of trustees a letter informing them that the commission recommended granting the church's amended special use permit to allow LCS to operate its school from the church property.  (Doc. #4-9 at 2).  The township board of trustees had a regular meeting on July 20, 2015, where approval of the permit was discussed and voted on.  (Doc. #4-10).  A "call to the public" was made; three people asked the board to approve the permit.  (*Id.* at 2).  The motion failed by 4-3 vote.  (*Id.* at 3).  The meeting minutes do not reflect any formal reasons for denying the permit.  Thus, at the

board's next regular meeting, which took place on August 3, 2015, the board clarified the previous action it took on July 20.  (Doc. #4-11 at 2).  Again, by 4-3 vote, the board voted to deny the church's application to amend its special use permit.  The following reasons were provided:

> 1.) The expanded use of the church to include a K-12 school will exacerbate the existing and historical negative impacts of the church on the adjacent neighborhood.  The need for active traffic management and restricted egress from the facility provides that the site cannot accommodate the use property and it increases the potential for negative off-site traffic impacts.
> 2.) The proposed use is not consistent with the following goals of the Master Plan:
> > a. "Achieve well-planned, safe, balanced and pleasant residential neighborhoods."
> > b. Promote harmonious and organized development consistent with adjacent land uses."
> 3.) The project is contrary to the statement of purpose for the Single Family Residential Zoning in regard to items 3.01.02(e.) and (g.) and (I
> 4.) .) as follows:
> > a. 3.01.02(e.) – "Discourage any use of land which may overburden public infrastructure and services and the areas natural resources."
> > b. 3.01.02(g.) – "Discourage land use which would generate excessive traffic on residential streets."
> > c. 3.01.02(I.) – "Prohibit any land use that would substantially interfere with the development, utilization or continuation of single family dwellings in the District."
> 5.) The proposed use significantly alters the existing or intended character of the general vicinity.
> 6.) The need for traffic management personnel and the potential off-site impacts created by forced right-turn only exiting will be detrimental to the natural environment, public health, safety or welfare by reason of excessive production of traffic.  The proposed "D" condition on exit from Church grounds during pick-up and drop-off provides a detriment to the existing walking path, other neighborhoods/buildings for turn-around, in addition to an impact on neighborhood travel including traffic from Worden Lake, Pine Creek, and travelers from the west towards Brighton.  In addition, current conditions of this area include the primary hub for the Brighton Area Schools, with Honung (elementary), Maltby (intermediate), Scranton (7/8th grade) and Brighton High School.  While not all students attending Scranton will flow through Brighton Road, Scranton was not taken into consideration.  It is reasonable to suggest parents with students at both schools drop off at the High School and then proceed to Scranton which starts school at 7:50 a.m.

7.) The potential negative impacts to be created by the use will not be sufficiently mitigated by the conditions of the proposal.

8.) The Nazarene Church has a history of non-compliance with past site plan and ordinance requirements resulting in a negative impact on surrounding neighborhoods, notably found in Planning Commission minutes from August 28, 2000, May 12, 2003, July 22, 2013 and April 2015 through current. Historical and consistent behavior suggests further non-compliance from petitioners.  Specific issues include the following:

     a. The applicant has not yet fully implemented the project approved by the Township in 2013.  Of particular note are the installation of additional landscaping and parking lot islands;

     b. The applicant has continued to allow a driver's testing operation, despite being informed that it is an illegal nonconforming use of the property; and

     c. The applicant has demonstrated disregard for existing approvals by making significant changes to their building design contrary to the approved 2013 plans and without necessary permits or approvals to do so.

(Doc. #4-11 at 3–4).

After the board's denial of the church's special use permit, LCS filed this lawsuit alleging that the board's decision is a violation of the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc, *et. seq.*  Specifically, LCS argues that the board's decision denying the church's amended special use permit imposes a substantial burden on LCS's religious exercise and the religious exercise of its students. LCS argues that the township has not advanced a compelling governmental interest in denying the amended special use permit, and, even if it had, it has not implemented the denial in the least restrictive means possible.  The school seeks declaratory and injunctive relief and attorneys' fees.

Recently, on August 14, 2015, the church withdrew its application with the State Department of Licensing and Regulations for the review of plans and documents related to the addition of a school on its property.  (Doc. #18-3).  The church was informed by

-12-

Livingston County that it would not issue a certificate of occupancy until the State approves the use of the building as a school.  (Doc. #18-4 at 2).

## II. STANDING

The parties do not address whether LCS has standing to bring this lawsuit (given that it was the Nazarene Church and not LCS that applied for — and was denied — an amended special use permit).  However, the court has an independent duty to make sure that the plaintiff has standing to bring an action before addressing the merits of the case. *Ward v. Alternative Health Delivery Sys., Inc.*, 261 F.3d 624, 626 (6th Cir. 2001) ("Standing is thought of as a 'jurisdictional' matter, and a plaintiff's lack of standing is said to deprive a court of jurisdiction.") (citations omitted).  "To establish Article III standing, plaintiffs must show (1) an 'injury in fact,' (2) a 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Green Party of Tennessee v. Hargett*, 791 F.3d 684, 695 (6th Cir. 2015) (citation omitted).

Here, although LCS challenges the denial of the *church's* application for an amended special use permit, and not the denial of any application it submitted itself, it appears that the Article III standing requirements are satisfied.

### A. Injury In Fact

An injury in fact "ensures that the plaintiff[] ha[s] a 'personal stake in the outcome of the controversy.'" *Green Party*, 791 F.3d at 695–96 (citation omitted).  This injury must be "concrete and particularized," "actual and imminent," and not "conjectural or hypothetical."  *Susan B. Anthony List v. Driehaus*, 134 S.Ct. 2334, 2341 (2014) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  Moreover, "[a]n allegation of

future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" *Id.* (citing *Clapper v. Amnesty Int'l USA*, 133 S.Ct. 1138, 1150 n.5 (2013) (quotation marks omitted)).

The township board's denial of the church's amended special use permit directly impacts LCS's ability to operate its school at the location it desires.  Thus, LCS has a "personal stake in the outcome of the controversy." *Green Party*, 791 F.3d at 695–96.  This injury is "actual and imminent," *Susan B. Anthony*, 134 S.Ct. at 2341, given that the 2015-16 school year is set to begin on September 8, 2015.  Without the approval of the church's amended special use permit, LCS will be unable to relocate to the church property (although it has entered into a lease with the church and prepaid $70,000 of the lease) for the planned 2015-16 school year.  LCS has established an injury in fact.

### B. Causation

Causation requires a "causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Lujan*, 504 U.S. at 560–61 (citing *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41–42 (1976)).

The causation element appears satisfied in this case.  The injury LCS complains of — a violation of RLUIPA — is "fairly traceable" to the board's challenged action denying the church's amended special use permit.  The amended special use permit specifically relates to allowing LCS to operate a school on the church's property.

### C. Redressability

-14-

Finally, LCS must establish that it is "likely" as opposed to merely "speculative" that the injury will be "'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (citation omitted).

A decision by the court that the township's denial of the church's amended special use permit is a violation of LCS's rights under the RLUIPA will provide redress for LCS's injury. In other words, a favorable decision by the court will require the church's amended special use permit to be granted, which in turn would allow LCS to operate its school on the church's property. Therefore, the redressability requirement is satisfied.

Given the court's conclusion that it has standing, the court turns next to the merits of LCS's request for a TRO.[3]

### III. TRO/PRELIMINARY INJUNCTION MOTION

#### A. Legal Standard

District courts consider and balance four factors when ruling on a motion for preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Chabad of Southern*

---

[3] The standing doctrine also dictates that prudential concerns — which do not arise under Article III and are not jurisdictional — may play a role in a court's decision whether to hear a dispute. *United States v. Windsor*, 133 S.Ct. 2675, 2687 (2013) ("Even when Article III permits the exercise of federal jurisdiction, prudential considerations demand that the Court insist upon 'that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'") (citing *Baker v. Carr*, 369 U.S. 186, 204 (1962)). Prudential concerns do not stand as an impediment to the court hearing this case. LCS is the proper party to bring this action because it has the most to lose from the township's denial of the church's amended special use permit given its leasehold interest in the church property.

*Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 432 (6th Cir. 2004)

(citation and internal quotation mark omitted).

### B. The RLUIPA

LCS's complaint alleges that the township's denial of the church's amended special

use permit is a violation of the RLUIPA.  The RLUIPA provides:

(a) Substantial burdens

(1) General rule

No government shall impose or implement a land use regulation in a
manner that imposes a substantial burden on the religious exercise of
a person, including a religious assembly or institution, unless the
government demonstrates that imposition of the burden on that
person, assembly, or institution–

(A) is in furtherance of a compelling governmental interest; and

(B) is the least restrictive means of furthering that compelling
governmental interest.

42 U.S.C. § 2000cc.

The statute further provides:

(2) Scope of application

This subsection applies in any case in which–

* * * *

(C) the substantial burden is imposed in the implementation of
a land use regulation or system of land use regulations, under
which a government makes, or has in place formal or informal
procedures or practices that permit the government to make,
individualized assessments of the proposed uses for the
property involved.

*Id.* § 2000cc(a)(2).

### C. Analysis

The court considers and balances the four TRO factors below.

### 1. Likelihood of success on the merits

The likelihood of success on the merits is an important factor.  The Sixth Circuit has explained that "a finding of no likelihood of success 'is usually fatal.'" *Abney v. Amgen, Inc.*, 443 F.3d 540, 547 (6th Cir. 2006) (citation omitted); *see also Gonzales v. Nat'l Bd. Of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).  Because a preliminary injunction is an "extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in [the] limited circumstances which clearly demand it," the plaintiff is required to make a showing of "a strong likelihood of success on the merits."  *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (citations and quotation marks omitted).

LCS argues that it is likely to succeed on the merits of its RLUIPA claim.  LCS contends that (1) the denial of the church's amended special use permit has placed a substantial burden on LCS's religious exercise; (2) the township does not have a compelling governmental interest in denying the amended special use permit; and (3) even if the township has a compelling governmental interest, it has not accomplished its interest through the least restrictive means necessary.  The township responds in opposition arguing that LCS has not established any of the requirements to support a RLUIPA violation.

The parties dispute whether LCS has made a "strong showing" that the township's denial of the church's amended special use permit substantially burdens LCS's religious exercise.  The term "substantial burden" is not defined in the RLUIPA; however, the legislative history of the RLUIPA "indicates that the 'term substantial burden as used in this Act is not intended to be given any broader interpretation than the Supreme Court's

articulation of the concept of substantial burden or religious exercise." *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 733–34 (6th Cir. 2007) (citing 146 CONG. REC. S7774–01, 7776 (daily ed. July 27, 2000) (joint statement of Sens. Hatch and Kennedy)) (internal quotation marks omitted).   Upon full consideration of the parties' arguments, the court determines that LCS has not shown a strong likelihood of succeeding on the merits of its claim.

After surveying a wide array of decisions, the Sixth Circuit in *Living Water* provided guidance for determining whether a challenged action presents a "substantial burden" under the RLUIPA:

> We decline to set a bright line test by which to "measure" a substantial burden and, instead, look for a framework to apply to the facts before us.  To that end, we find the following consideration helpful: though the government action may make religious exercise more expensive or difficult, does the government action place substantial pressure on a religious institution to violate its religious beliefs or effectively bar a religious institution from using its property in the exercise of its religion?

*Id.* at 737.

*Living Water* involved "a small but growing Christian congregation with educational and daycare ministries in Meridian Charter Township, Michigan," seeking to use a six-acre parcel it owned in the township to build a 28,500 square foot elementary school for kindergarten through 8th grade.   258 F. App'x at 730.   The congregation had been operating the school at different locations but had problems doing so.   Initially, when the school opened in 2001, it was housed at the congregation's building 25 miles away from its Meridian Township church.   *Id.* at 732.   However, there were difficulties transporting students that far away, so the school was moved in 2002 to a house approximately 2.5 miles away from the congregation's church in Meridian Township.   *Id.*   This location, was

-18-

problematic, however, because it was "too small." *Id.* The school was, therefore, moved to a nearby office building, but that building was zoned for professional/office use. *Id.* Finally, the congregation rented gym facilities for the school, but "because the school [was] off-site and operated by the same staff that operated the church, [the congregation] also encountered difficulties in coordinating the staff." *Id.* As a result, the congregation sought to amend its special use permit to allow it to build a school on its existing property.

The congregation had already been operating a sanctuary and daycare for 40 children on the property. *Id.* at 730. The township granted the congregation's application for a special use permit to build the school, but placed an expiration date of May 19, 2001 on the permit. *Id.* By May 19, the congregation had not begun substantial construction on the project and sought to extend its special use permit. *Id.* at 730. However, because of a new township policy implemented in April 2001, the township denied the congregation's request for an extension. *Id.* at 731. The congregation lost its initial investment of $35,000 or $40,000 in planning documents. *Id.*

The congregation reapplied on May 21, 2003 for an amendment to its special use permit to allow it to build the school on its property. *Id.* After two public hearings before the planning commission, the commission recommended that the township board approve the amendment to the special use permit. *Id.* The planning commission's recommendation was granted in part and denied in part by the township board. The board granted the special use permit to allow "'the non-residential use of an appropriately sized school in a residential district,' subject to conditions, including a maximum enrollment of 125 students." *Id.* at 732. However, the board denied the special use permit "for 'construction of an addition that results in a building or combination of buildings with a gross floor area of

25,000 square feet or greater.'" *Id.*  The reason being that "'the size of the proposed church and school facility in relationship to the size of the subject site is out of proportion to similarly situated schools and combined church and school facilities within the Township and inconsistent with those review criteria and standards for the granting of a special use permit. . . .'" *Id.*

The denial of the special use permit affected the congregation because it had outgrown its space necessitating the need to rent offices off-site.  *Id.* at 732.  "Due to the frustration and confusion arising from the space constraints, [the congregation] . . . lost current and potential members and its ability to recruit students for its school has been limited." *Id.*

The congregation filed a lawsuit against the township alleging a violation of the RLUIPA.  *Id.*  Specifically, the congregation argued that the township's denial of the amendment to its special use permit:

> (1) effectively caused the church to shut down its daycare ministry because there was not enough room to juggle the logistics of operating both the daycare and other church ministries; (2) denied the church's religious school a permanent home, and the resulting uncertainty has limited the church's ability to recruit students to its school (thereby denying the school the opportunity to minister to students); (3) caused the church to lose members because there is insufficient space and seating to add new services and accommodate new members; (4) forced the church to cut back on activities, including a midweek worship service, adult education and outreach activities, and children's ministry; and (5) denied the church's staff onsite office space to run the church's ministries, including the school.

*Id.* at 738.  The district court granted judgment in favor of the congregation.  *Id.* at 732.  The Sixth Circuit, however, reversed the decision of the district court.

Applying the "substantial burden" standard above to the facts before it, the *Living Water* court reasoned that the township's denial of the congregation's special use permit

did not amount to a substantial burden on the congregation's free exercise of religion. Important to reaching this conclusion was the court's understanding that the congregation had a building where it could worship and conduct its ministries/programs, and the congregation had permission to build a school on its property, just not as big as it wanted to. *Id.* at 739. The court explained:

> We return to the issue as we framed it earlier in this analysis: although the government action may make Living Water's religious exercise more expensive or difficult, does that government action place substantial pressure on Living Water to violate its religious beliefs or effectively bar the church from using its property in the exercise of its religion? We conclude that the Township's denial does neither. Ideally, no doubt, Living Water would have an unlimited and ever-expanding place of worship with open doors to all who are interested—the same would surely apply to its school. The Township's action here, and the zoning ordinance in general, burdens this hope and objective. And although the Township's action may make Living Water's religious exercise more expensive or difficult, we cannot say that it places substantial pressure on this religious institution to violate its religious beliefs or that it effectively bars the institution from using its property in the exercise of its religion.

*Id.* at 739. Because "nothing the Township has done requires Living Water to violate or modify or forego its religious beliefs or precepts, or to choose between those beliefs and a benefit to which the church is entitled," the court found no substantial burden on the congregation's free exercise of religion. *Id.* at 741 (citations omitted).

Applying the substantial burden standard articulated in *Living Water*, LCS is required to show that, "though the government action may make religious exercise more expensive or difficult, . . . the government action place[s] substantial pressure on [it] to violate its religious beliefs or effectively bar[s] [it] from using its property in the exercise of its religion[.]" 258 F. App'x at 737. At this juncture, LCS has not made a strong showing of a substantial burden. LCS can still operate its school at the Pinckney location, and, more recently, has found a second location where it plans to operate for the 2015-16 school year.

Thus, "nothing the Township has done requires [LCS] to violate or modify or forego its religious beliefs or precepts, or to choose between those beliefs and a benefit to which [LCS] is entitled[.]"  *Id.* at 741 (citations omitted).  Although it may be less convenient or more expensive for LCS to operate its school from a different location, *Living Water* instructs that this does not equal a substantial burden on LCS's ability to freely exercise its religious tenets.  Because LCS has not "proffered evidence showing that it cannot carry out its church missions and ministries due to the Township's denial," it has not established a substantial burden on its free exercise of religion.  *Id.* (citing *Westchester Day Sch.*, 504 F.3d 338).

LCS attempts to distinguish *Living Water*.  LCS contends that, in *Living Water*, the congregation was permitted to build a school, just not the size it had hoped for.  Here, LCS argues that it is not permitted to operate a school at all on the church property.  This difference is of no moment.  The Sixth Circuit made clear in *Living Water* that the inquiry is whether the township placed "substantial pressure on a religious institution to violate its religious beliefs or effectively bar a religious institution from using its property in the exercise of its religion."  There has been no showing thus far that the township has violated LCS's religious beliefs.  LCS can operate its school, just not from the property it desires.  LCS seeks to frame the issue in a limited fashion as it relates only to its leasehold interest in the property arguing that the township has effectively barred it from using its leased property in the exercise of its religion.  However, given that the *church* applied for the amended special use permit, the court cannot limit its inquiry to LCS's leasehold interest.  It is relevant that the township's decision does not bar the church from exercising its

religious beliefs or using its property in furtherance of its religious exercise.  There has not been an absolute bar on religious exercise at the property.

LCS also misplaces its reliance on the Second Circuit's decision in *Westchester Day School v. Village of Mamaroneck*, 504 F.3d 338 (2d Cir. 2007).  In *Westchester Day School*, the plaintiff school operated an "Orthodox Jewish co-educational day school with classes from pre-school to eighth grade."  504 F.3d at 344.  Seeking to expand its school, the plaintiff submitted construction plans to the defendant village and an application for a required special permit.  *Id.*  The village denied the plaintiff's application.  *Id.*  The plaintiff sued arguing that the denial of the special permit violated RLUIPA, 42 U.S.C. §§ 2000cc *et seq. Id.*

Addressing the "substantial burden" requirement, the Second Circuit recognized that, in analyzing RLUIPA claims, a "number of courts" look to Supreme Court precedent that teaches "that a substantial burden on religious exercise exists when an individual is required to 'choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand.'" *Id.* at 348 (citations omitted).  However, the court reasoned that "in the context of land use, a religious institution is not ordinarily faced with the same dilemma of choosing between religious precepts and government benefits."  *Id.* at 348–49.  Thus, the court explained that "when there has been a denial of a religious institution's building application, courts appropriately speak of government action that directly *coerces* the religious institution to change its behavior, rather than government action that forces the religious entity to choose between religious precepts and government benefits."  *Id.* at 349 (citation omitted).

The *Westchester Day School* court explained, however, "that where the denial of an institution's application to build will have minimal impact on the institution's religious exercise, it does not constitute a substantial burden, even when the denial is definitive." *Id.* at 349.  The court reasoned:

> There must exist a close nexus between the coerced or impeded conduct and the institution's religious exercise for such conduct to be a substantial burden on that religious exercise.  Imagine, for example, a situation where a school could easily rearrange existing classrooms to meet its religious needs in the face of a rejected application to renovate.  In such case, the denial would not substantially threaten the institution's religious exercise, and there would be no substantial burden, even though the school was refused the opportunity to expand its facilities.

*Id.*  On the other hand, "[w]hen the school has no ready alternatives, or where the alternatives require substantial 'delay, uncertainty, and expense,' a complete denial of the school's application might be indicative of a substantial burden."  *Id.* (citing *Saints Constantine and Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 901 (7th Cir. 2005)).  In addition, the court explained that a substantial burden may be shown "where land use restrictions are imposed on the religious institution arbitrarily, capriciously, or unlawfully."  *Id.* at 350.

Applying the above standards to the facts before it, the *Westchester Day School* court concluded that the plaintiff had established that its "religious exercise was substantially burdened by the . . . arbitrary and unlawful denial of its application."  *Id.* at 353.  Specifically, the court recognized that, among other things, (1) the zoning board improperly accused the school of a "willful attempt" to mislead the zoning board without any supporting evidence; and (2) the zoning board alleged deficiencies in the school's traffic study that were unsupported by the evidence.  *Id.* at 351.  Thus, "the record convincingly demonstrate[d] that the zoning decision . . . was characterized not simply by the occasional

-24-

errors that can attend the task of government but by an arbitrary blindness to the facts." *Id.* at 351–52. Moreover, the court determined that the school did not have a quick, reliable alternative and the zoning board's denial was absolute, not conditional. *Id.* at 352. Based on all of these factors, the court concluded that the denial of the plaintiff's application substantially burdened the plaintiff by forcing it to continue to teach in inadequate facilities. *Id.* at 352–53.

Comparing the facts of this case to *Westchester Day School*, LCS contends that the township's decision to deny the church's amended special use permit was arbitrary and capricious and bore no relationship to the public health, safety or welfare of the residents of the township, amounting to a "substantial burden" on its free exercise of religion. (Pl's. Br. at 15). Specifically, LCS argues that the township's reasons for denying the amended special use permit (vague references to negative neighborhood impacts; traffic impacts; inconsistency with the township's master plan; and the church's history of non-compliance with its existing special use permit) contradict the findings of the planning commission and the township's consultants, supporting the view that the township's decision was arbitrary and capricious.

LCS cannot meet its burden in establishing that the denial has more than a minimal impact on its free exercise of religion. The township's denial of the church's special use permit does not preclude either the church (the amended special use permit applicant) or LCS from freely exercising their religious tenets. The church is free to continue its normal operations pursuant to its existing special use permit. Similarly, LCS is free to continue operating as a religious school, and it has a building in Pinckney that it owns and has been using as the location for its school for the past nine years. Moreover, LCS recently found

a second location from which it can operate. The fact that LCS has "ready alternatives" more than sufficient to meet its religious needs despite the township's denial makes it unlikely that it has suffered a substantial burden on its free exercise of religion. 504 F.3d at 349 ("[W]here the denial of an institution's application to build will have minimal impact on the institution's religious exercise, it does not constitute a substantial burden[.]"). Rather, LCS has established only that it may be inconvenienced by having to operate from a different location.[4]

LCS's failure to establish a strong showing of substantial burden on its free exercise of religion, standing alone, supports the denial of a TRO. *Living Water*, 253 F. App'x at 742 ("Because we find no substantial burden, we do not reach the district court's conclusions with regard to whether the Township's action was in furtherance of a compelling governmental interest or was the least restrictive means of furthering that interest.").

### 2. Irreparable Injury

The next factor the court considers in deciding whether to grant a TRO is "whether the movant would suffer irreparable injury without the injunction[.]" *Chabad of Southern Ohio*, 363 F.3d at 432. Harm is irreparable "if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urban Cnty. Gov.*, 305 F.3d 566, 578 (6th Cir. 2002) (citation omitted). The "moving party must show that irreparable harm is 'both certain

---

[4] LCS also relies on *Lighthouse Community Church of God v. City of Southfield*, No. 05-40220, 2007 WL 30280 (E.D. Mich. Jan. 3, 2007) (Gadola, J.). For the same reasons the court determines that *Westchester Day School* is distinguishable from this case, so too is *Lighthouse Community Church of God*. There is nothing standing in the way of the church using its building to exercise its religious beliefs. Nor is there anything standing in the way of LCS exercising its religious beliefs.

-26-

and immediate, rather than speculative or theoretical.'" *Contech Casting, LLC v. ZF Steering Sys., LLC*, 931 F.Supp.2d 809, 818 (E.D. Mich. 2013) (citation omitted).

LCS argues that the township's decision deprives LCS of its First Amendment right to exercise its religious beliefs. Moreover, LCS contends that, if the township is not enjoined form enforcing the denial of the amended special use permit, LCS will not have an adequate place to operate its school for the 2015-16 school year forcing it to shut down. If the school returns to the Pinckney property, LCS contends that it will have to limit enrollment and such a decision would also affect Light of the World Academy's 2015-16 school year.

LCS's contention that it will not have an adequate place to operate its school for the 2015-16 is not supported by the record. Although LCS does not want to use its Pinckney location (which is leased to the Light of the World Academy), LCS has conceded that it has a location from which it plans to begin the 2015-16 school year. Therefore, there is no immediate harm to LCS necessitating a TRO.

Moreover, as explained above, the church recently withdrew its request that the State of Michigan approve its building for use as a school. Without this approval, Livingston County will not issue a certificate of occupancy. Thus, even if the court granted LCS's request for a TRO, LCS would be unable to begin the school year at the church building by September 8, 2015. Withdrawal of the church's request with the State undermines its claim of immediate harm.

Finally, all of the alleged harm LCS claims it will suffer absent a TRO (loss of enrollment, loss of rental income, loss of prepaid rental payments to church) can be quantified and remedied with an award of money damages after full consideration of the

-27-

evidence.  Thus, LCS has not established irreparable harm absent a TRO.  *Contech Casting, LLC*, 931 F.Supp.2d at 818 ("[I]rreparable harm will not be found where alternatives already available to the plaintiff make an injunction unnecessary.") (citation and internal quotation marks omitted).

### 3. Harm to Others

Next, the court considers "whether issuance of the injunction would cause substantial harm to others[.]"  *Chabad of Southern Ohio*, 363 F.3d at 432.

LCS argues that the harm to others if an injunction is not granted outweighs the harm to the township if an injunction is granted.  Specifically, if a TRO is not issued, LCS contends that students and families of LCS and the Light of the World Academy will be harmed.  However, any harm to the students and families is a direct result of LCS's failure to first ensure that the church was able to obtain a special use permit before announcing the changes in location.  This harm is self created.

Moreover, there are equal concerns to the general public if the TRO is granted.  Concerned neighbors of the church showed up to every public meeting to protest actions taken by the church affecting the residents.  Historically, the church has had a negative impact on surrounding neighborhoods.  Thus, when balancing the harm to others, a TRO is unwarranted.

### 4. Public Interest

Finally, the court considers "whether the public interest would be served by issuance of the injunction."  *Chabad of Southern Ohio*, 363 F.3d at 432.

LCS argues that the public interest would be served by issuance of an injunction because "[t]he public as a whole has a significant interest in ensuring enforcement and

equal protection of the laws and the full expression of religious and First Amendment liberties." (Doc. #4 at 34). However, LCS has not established a First Amendment violation, nor has it even alleged a constitutional violation. Moreover, as explained above, LCS has not shown a strong likelihood of succeeding on its claim that its religious exercise has been substantially burdened. LCS has not established that the public interest would be served by issuance of a TRO.

## IV. CONCLUSION

In balancing the TRO factors above, the court concludes that LCS is not entitled to a TRO. Thus, for these reasons, and the reasons explained on the record at the hearing, LCS's motion for a TRO is DENIED.

IT IS SO ORDERED.

Dated:  September 15, 2015

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
September 15, 2015, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk

-29-