UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LIVINGSTON CHRISTIAN SCHOOLS,
a Michigan nonprofit corporation,

        Plaintiff,

                              CASE NO. 15-12793
      v.                      HONORABLE GEORGE CARAM STEEH

GENOA CHARTER TOWNSHIP, a
Michigan municipal corporation,

        Defendant.

_____/

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (Doc. 35)**

      This matter is before the court on Defendant Genoa Charter Township's

(Township) motion for summary judgment.  Plaintiff Livingston Christian Schools (LCS)

brought this action against the Township under the Religious Land Use and

Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc *et seq.*, the First

Amendment to the United States Constitution, and the Fourteenth Amendment to the

United States Constitution.  LCS also requested injunctive relief in its complaint, but the

court denied that request. (Doc. 4 and Doc. 22).

      LCS alleges that the Township violated RLUIPA by denying the Brighton Church

of the Nazarene (Church)–a non-party to this case–a special use permit that would have

allowed LCS to relocate to property owned by the Church. Specifically, LCS argues that

the Township's decision denying the Church's amended special use permit imposes a

substantial burden on LCS's religious exercise and the religious exercise of its students.

-1-

LCS additionally argues that the Township has not advanced a compelling governmental interest in denying the amended special use permit, and, even if it had, it has not implemented the denial in the least restrictive means possible. LCS further alleges that the denial of the permit application violated both its First Amendment right to free exercise of religion as well as its Fourteenth Amendment right to Substantive Due Process. The Township filed this summary judgment motion, and the court heard oral argument on June 15, 2016.

For the reasons stated in the court's opinion, the Township's motion for summary judgment is GRANTED.

## I. STATEMENT OF FACTS[1]

The Nazarene Church sits on approximately 16.5 acres (37,620 square feet) of property in Genoa Charter Township and includes a Christian education center, a sanctuary, Church offices, a recreational facility and a residential parsonage.  (Doc. 4, Pg ID 113). The Church is bounded to the west by another church, to the east and south by public roads and to the north by neighborhoods.  The Church conducts "its worship services and ministries . . . on weekends and select weeknights, and approximately 1,000 people typically attend weekend worship services."  (*Id.* at 114).  The Church property is located in the Township's "suburban residential zoning district."  (Doc. 11, Pg ID 274). As such, the Church has sought several special use permits between 1991 and 2013. All of these special use permit applications were approved by the Township. Over the

---

[1]For a complete recitation of the facts, see the court's Opinion and Order Denying Plaintiff's Emergency Motion for Temporary Restraining Order (Doc. 22).

years, homeowners in the surrounding neighborhoods complained about the Church's existing activities, which created, among other things, noise, littering, and safety issues.

LCS is a non-profit organization that has been operating a pre-kindergarten through 12th grade Christian school since its formation in 2005.  (Doc. 4-2, Pg ID 139).  For the past nine years, LCS operated the school at a building it owns in Pinckney, Michigan.  (*Id.*).  LCS insists it must relocate to meet its growing enrollment, academic objectives, and mission to serve Livingston County (*Id.* at 140-41).  The Township claims these are not LCS's true reasons. Rather, according to the Township, LCS wants to relocate to reverse a recent trend of decreasing enrollment. (Doc. 35, Pg ID 939).

Recently, LCS sought to relocate from Pinckney, Michigan to the Church's building to operate a Christian school.  To facilitate the move to a new building, LCS entered into a five-year lease agreement with the Church beginning June 1, 2015. (Doc. 4-4). LCS prepaid rent to the Church in the amount of approximately $70,000. (Doc. 4-2, Pg ID 140). After opening enrollment to the community, with the help of LCS's social media campaign, LCS's enrollment increased by over 20% from 139 students during the 2014-2015 school year to 168 students for the upcoming 2015-2016 school year.  (*Id.*). In anticipation of the move to the Nazarene Church, LCS agreed to lease the property it owns in Pinckney to a charter school, Light of the World Academy, for $5,000 per month.  (Doc. 4-2, Pg ID 141).

The Township heard "through the grapevine" about LCS's anticipated relocation to the Church property beginning in the 2015-2016 school year and advised the Church that it would need to apply for a special use permit to allow LCS to operate a school on the Church property.  (Doc. 11 at 288). In March 2015, the Church applied for an

-3-

amendment to the existing special use permit it was issued in 2013 and submitted an impact assessment in support of the amendment.  (Doc. 4-5); (Doc. 12-3). The assessment noted that "the School will add an increase of approximately 50 cars using the exiting parking facilities on Monday thru [sic] Friday."  (Doc. 12-3, Pg ID 459).  In addition, the existing playground would be used by the school Monday through Friday during the mid-day, and the parking lot, on occasion, would be used for daytime activities.  (*Id.*).  The assessment also notes that the school would increase the number of employees by approximately 25 people and there would be 150-250 students.  (*Id.* at 460).  Finally, as it relates to traffic, the assessment states that LCS "is expected to generate 75 ingress/egress trips from the west and 50 ingress/egress trips from the east prior/after these start times. . . . Little of this traffic will occur during "peak" traffic hours." (*Id.* at 461). The assessment also noted that the Livingston County Road Commission defined the impact LCS will have on the intersection of Brighton Road and the Church driveway as minor. (*Id.*).

Four Planning Commission meetings open to the public's comment took place between April and July 2015 to determine whether to recommend approval to the Township board of the Church's application to amend its existing special use permit. Over this four-month period, the Church worked with the Planning Commission and others to address all outstanding issues and arrange for the operation of LCS beginning in the 2015-2016 school year.  At each Planning Commission meeting, nearby neighbors of the Church complained about multiple issues, the central theme being that allowing LCS to operate a school at the Church would be bad for traffic in the area.

-4-

Neighbors also complained that the Church had never complied with conditions of its existing special use permit.

The Planning Commission's planning and zoning consultant, LSL Planning, stated that "[t]here are concerns of traffic generation and protection of the adjacent neighborhood to the east.  We believe a traffic impact study is necessary to ensure there are no issues with the roadway[.]" (Doc. 12-5, Pg ID 464). The Township's engineering consultant, Tetra Tech, also recommended that the Township require the Church to submit a traffic study.  (Doc. 12-6).  Tetra Tech stated that the "biggest concern is the traffic generated by a school use and its coordination with the other public school traffic utilizing Brighton Road."  (*Id.*).

Attempting to rectify the issues raised in the public hearings, LCS hired Boss Engineering to conduct a traffic impact study.  Boss provided a report on May 1, 2015, which was amended on May 20 and again on June 23, 2015, after receiving comments from Tetra Tech and the Planning Commission.  (Doc. 4-6); (Doc. 12-7).  The final conclusions and recommendations by Boss were as follows:

- The Livingston Christian School will have minimal impact on Brighton Road in the a.m. and p.m. peak traffic hours for the school.  The Brighton Road Level of Service will remain at A.

- The Livingston Christian School will have no impact on the traffic signals located at Brighton High School based on the Livingston County Road Commission Synchro model and Bauer Road based on the distance from the Livingston Christian School to the intersection.

- There will be a significant impact on the Monday through Friday use of the Church parking lot during the September to June time period when the school is in session.

-5-

- Information shall be provided to students, parents and staff during orientation that recommends right turns out of the parking lot after drop off and pick up to limit delays within the parking lot. The Traffic Control Director will direct left turn drivers into the left turn lane of the driveway at their discretion. The Traffic Director Roles and Responsibilities are defined in Appendix D. The traffic pick up and drop off Parent and Student Orientation Material is presented in Appendix E.

- Due to potentially long delays within the parking lot and at the driveway exit to Brighton Road school staff must be posted at critical locations to monitor the delays and to direct left turns out of the parking lot.

(Doc. 4-6, Pg ID 172). LSL Planning deferred to Tetra Tech for comment on the traffic study. (Doc. 4-7, Pg ID 204). Tetra Tech stated that it had "no further objections to approval of the site plan for approval contingent on [multiple] comments. . . ." (Doc. 4-8, Pg ID 209). Tetra Tech's comments focused on the Church managing traffic in its parking lot. (*Id.* at 208).

At the final Planning Commission meeting on July, 13, 2015, the commission recommended the Township board approve the Church's application for an amendment to its special use permit. (Doc. 13-3, Pg. ID 535). On July 16, 2015, the assistant Township manager, Kelly VanMarter, sent the Township board of trustees a letter informing them that the commission recommended granting the Church's amended special use permit to allow LCS to operate its school from the Church property. (Doc. 4-9, Pg ID 211). The Township board of trustees had a regular meeting on July 20, 2015, where approval of the permit was discussed and voted on. (Doc. 4-10). The motion failed by a 4-3 vote. (*Id.* at 215). The meeting minutes do not reflect any formal reasons for denying the permit. At the board's next regular meeting, which took place on August 3, 2015, the board clarified the reasons for its previous action of July 20.

(Doc. 4-11, Pg ID 217-18).  Again, by 4-3 vote, the board voted to deny the Church's

application to amend its special use permit.  The following reasons were provided:

> 1.) The expanded use of the church to include a K-12 school will exacerbate the existing and historical negative impacts of the church on the adjacent neighborhood.  The need for active traffic management and restricted egress from the facility provides that the site cannot accommodate the use property and it increases the potential for negative off-site traffic impacts.
>
> 2.) The proposed use is not consistent with the following goals of the Master Plan:
>> a. "Achieve well-planned, safe, balanced and pleasant residential neighborhoods."
>> b. Promote harmonious and organized development consistent with adjacent land uses."
>
> 3.) The project is contrary to the statement of purpose for the Single family Residential Zoning in regard to items 3.01.02(e.) and (g.) and (i
> 4.) .) as follows:
>> a. 3.01.02(e.) – "Discourage any use of land which may overburden public infrastructure and services and the areas natural resources."
>> b. 3.01.02(g.) – "Discourage land use which would generate excessive traffic on residential streets."
>> c. 3.01.02(I.) – "Prohibit any land use that would substantially interfere with the development, utilization or continuation of single family dwellings in the District."
> 5.) The proposed use significantly alters the existing or intended character of the general vicinity.
> 6.) The need for traffic management personnel and the potential off-site impacts created by forced right-turn only exiting will be detrimental to the natural environment, public health, safety or welfare by reason of excessive production of traffic.  The proposed "D" condition on exit from Church grounds during pick-up and drop-off provides a detriment to the existing walking path, other neighborhoods/buildings for turn-around, in addition to an impact on neighborhood travel including traffic from Worden Lake, Pine Creek, and travelers from the west towards Brighton.  In addition, current conditions of this area include the primary hub for the Brighton Area Schools, with Honung (elementary), Maltby (intermediate), Scranton (7/8th grade) and Brighton High School.  While not all students attending Scranton will flow through Brighton Road, Scranton was not taken into consideration.  It is reasonable to suggest parents with students at both schools drop off at the High School and then proceed to Scranton which starts school at 7:50 a.m.

7.) The potential negative impacts to be created by the use will not be
sufficiently mitigated by the conditions of the proposal.
8.) The Nazarene Church has a history of non-compliance with past site
plan and ordinance requirements resulting in a negative impact on
surrounding neighborhoods, notably found in Planning Commission
minutes from August 28, 2000, May 12, 2003, July 22, 2013 and April
2015 through current.  Historical and consistent behavior suggests further
non-compliance from petitioners.  Specific issues include the following:

> a. The applicant has not yet fully implemented the project approved by the
> Township in 2013.  Of particular note are the installation of additional
> landscaping and parking lot islands;
> b. The applicant has continued to allow a driver's testing operation,
> despite being informed that it is an illegal nonconforming use of the
> property; and
> c. The applicant has demonstrated disregard for existing approvals by
> making significant changes to their building design contrary to the
> approved 2013 plans and without necessary permits or approvals to do
> so.

(*Id.* at 218–19).

After the Township's denial of the special use permit application, LCS filed this

lawsuit. On August 20, 2015, seventeen days after the Township's denial, LCS finalized

its contract to lease the Pinckney facility to Light of the World Academy. After filing this

suit, LCS also entered into a short term agreement to lease a building from Whitmore

Lake Public Schools for the 2015-2016 academic year.

## II. SUMMARY JUDGMENT LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) empowers the court to render summary

judgment "forthwith if the pleadings, depositions, answers to interrogatories and

admissions on file, together with the affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a

matter of law."  *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001).  The

Supreme Court has affirmed the court's use of summary judgment as an integral part of

the fair and efficient administration of justice.  The procedure is not a disfavored

procedural shortcut.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox*

*v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is

"'whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law.'"

*Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir.

2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  The

evidence and all reasonable inferences must be construed in the light most favorable to

the non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001).  "[T]he mere existence of

*some* alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no *genuine*

issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)

(emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d

900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there

is no genuine issue of material fact and that it is entitled to judgment as a matter of law,

the opposing party must come forward with "specific facts showing that there is a

genuine issue for trial."  *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968);

*see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  Mere

allegations or denials in the non-movant's pleadings will not meet this burden, nor will a

mere scintilla of evidence supporting the non-moving party.  *Anderson*, 477 U.S. at 248,

252.  Rather, there must be evidence on which a jury could reasonably find for the non-movant.  *McLean*, 224 F.3d at 800 (citing *Anderson*, 477 U.S. at 252).

IV. ANALYSIS

**A. Religious Land Use and Institutionalized Persons Act (RLUIPA)**

*1. Overview*

LCS and the Township primarily rely on the same arguments supporting claimed RLUIPA violations here as they did in their briefs in support and opposition to LCS's motion for a temporary restraining order. Accordingly, the court incorporates by reference the lengthy analysis explaining its ruling denying that motion and only briefly addresses those arguments previously advanced by the parties.

LCS's complaint alleges that the Township's denial of the Church's amended special use permit is a violation of the RLUIPA.  The RLUIPA provides:

> (a) Substantial burdens
>
> > (1) General rule
> >
> > No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution–
> >
> > > **(A)** is in furtherance of a compelling governmental interest;
> > >
> > > and
> > >
> > > **(B)** is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc.

The statute further provides:

-10-

(2) Scope of application

This subsection applies in any case in which–

* * * *

**(C)** the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved.

*Id.* § 2000cc(a)(2).

The primary point of contention between the parties is whether the Township's denial of the special use permit constitutes a substantial burden under RLUIPA. LCS also contends that the Township does not have a compelling governmental interest in denying the amended special use permit and that, even if the Township has a compelling governmental interest, it has not accomplished its interest through the least restrictive means necessary. The Township, however, does not address whether the Township had a compelling interest or employed the least restrictive means available, instead arguing exclusively that the Township's denial did not constitute a substantial burden.

### 2. The Township did not Impose a Substantial Burden on LCS

The term "substantial burden" is not defined in the RLUIPA. The Sixth Circuit in *Living Water Church of God v. Charter Twp. of Meridian* articulated a standard which requires LCS to show that, "though the government action may make religious exercise more expensive or difficult, . . .  the government action place[s] substantial pressure on [it] to violate its religious beliefs or effectively bar[s] [it] from using its property in the

-11-

exercise of its religion[.]" 258 F. App'x 729, 737. When the Township denied the Church's permit application, LCS had not yet leased its Pinckney property. So, it could have used that location as an alternate to the Church property. Additionally, LCS has operated for 2015-16 school year at the Whitmore Lake location. Thus, "nothing the Township has done requires [LCS] to violate or modify or forego its religious beliefs or precepts, or to choose between those beliefs and a benefit to which [LCS] is entitled[.]" *Id.* at 741 (citations omitted). While it may be less convenient or more expensive for LCS to operate its school from a different location, the circumstances present here do not constitute a substantial burden under the *Living Water* analysis. Because LCS has not "proffered evidence showing that it cannot carry out its church missions and ministries due to the Township's denial," it has not established a substantial burden on its free exercise of religion. *Id.* (citing *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338 (2d Cir. 2007)).

LCS also relies on *Harbor Missionary Church Corp. v. City of San Buenaventura*, No. 14-56137, 2016 WL 946537 (9th Cir. Mar. 14, 2016). In that case, a church operated a homeless ministry on its property. *Id.* at *1. The church considered ministering to the homeless a sacred duty. *Id.* After a few years of operation, the city told the church that it needed a conditional use permit to continue operating the homeless ministry. *Id.* The church applied and was denied a permit. *Id.* The church would have had to pay $1.4 million In order to relocate. *Id.* at *3. The church filed suit against the city, asking the district court for injunctive relief. *Id.* at *2. The district court held that the church was not likely to succeed on the merits because there was no substantial burden under RLUIPA. *Id.* The district court, therefore, denied injunctive

relief. *Id.* The church appealed, and the Ninth Circuit reversed the district court's decision finding that there was, in fact, a substantial burden. *Id.* at *3.

*Harbor Missionary* is distinguishable from the matter at hand. As this court noted in its order denying LCS's motion for temporary restraining order, where there is a ready alternative, there is no substantial burden. (Doc. 22, Pg. ID 659-60). *Westchester Day School v. Vill. of Mamaroneck*, 504 F.3d 338, 349 (2d Cir. 2007). The church in *Harbor Missionary* had no ready alternative. They would either have to pay $1.4 million or forfeit their "sacred duty" of ministering to the homeless. LCS, on the other hand, had ready alternatives in the form of both the Pinckney and Whitmore Lake locations. There is nothing standing in the way of LCS exercising its religious beliefs.

During oral argument, LCS also noted that there are currently no religious schools in Livingston county. LCS claimed this was indicative of the Township's discriminatory intent and violation of the purpose of RLUIPA. The Pinckney facility, however, is in Livingston County and was available to LCS when the Township denied its special use permit application. LCS did not lease that space to Light of the World Academy until after the Township's denial. Second, as demonstrated above, RLUIPA analysis begins with determining whether there was a substantial burden, not whether similarly situated religious institutions exist within a given area. Because there is no indication that LCS is being prevented from exercising its religious beliefs, there is no substantial burden here.[2]

---

[2] Given that the Township did not impose a "substantial burden" on LCS's religious exercise, this court will not address whether there was a "compelling governmental interest" or whether the Township's actions were the "least restrictive means of furthering that interest." *Living Water*, 253 F. App'x at 742 ("Because we find

**B. First Amendment - Free Exercise of Religion**

LCS next alleges that the Township violated its constitutional right under the First Amendment to freely exercise its religious beliefs. The First Amendment establishes that "Congress shall make no law . . . prohibiting the free exercise [of religion]," U.S. Const. Amend. I, and this Free Exercise Clause has been made applicable to the states by incorporation into the Fourteenth Amendment. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 877 (1990).

*1. Standard of Review*

There is a disagreement between the parties as to which standard of review this court should apply. The Township argues that opening a school at this exact location is not a "fundamental tenet" of LCS's faith, and the Township's denial of the special use permit was, therefore, not a violation of the Free Exercise Clause. *See Lakewood Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood*, 699 F.2d 303, 307 (6th Cir. 1983) ("[B]uilding and owning a church is a desirable accessory of worship, not a fundamental tenet of the Congregation's religious beliefs."). LCS, on the other hand, argues that the Supreme Court recently rejected this "fundamental tenet" analysis when it clarified that courts should avoid making determinations regarding the centrality of a certain tenet of an individual's faith. *Employment Div., Dep't. Of Human Res. Of Oregon*

---

no substantial burden, we do not reach the district court's conclusions with regard to whether the Township's action was in furtherance of a compelling governmental interest or was the least restrictive means of furthering that interest.").

-14-

*v. Smith*, 494 U.S. 872, 886-87 (1990) ("It is no more appropriate for judges to determine the 'centrality' of religious beliefs before applying a 'compelling interest' test in the free exercise field, than it would be for them to determine the 'importance' of ideas before applying the 'compelling interest' test in the free speech field."). Under *Lakewood*, it appears that LCS would fail. Operating a school on the Church property is not a "fundamental tenet" of LCS's faith. It is merely a "desirable accessory," especially given the alternative locations at LCS's disposal. This court, however, does not need to decide whether and how *Lakewood* is impacted by *Smith* because, as the analysis below demonstrates, LCS fails under either analysis.

### 2. Application of the Neutral Law of General Applicability Standard

To establish a violation under the Free Exercise Clause, LCS must prove that the Township's zoning ordinance is not a neutral law of general applicability, either facially or as applied. When examining an as applied challenge, a court must look at whether the official action is religiously motivated by "survey[ing] meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993) (citing *Walz v. Tax Comm'n of New York City*, 397 U.S. 664, 696 (1970) (Harlan, J., concurring)) (internal quotation marks omitted). In drawing its conclusion, the court must pay particular attention to other possible motivations because "a social harm may have been a legitimate concern of government for reasons quite apart from discrimination." *Id.* at 535.

LCS does not argue that the ordinance is facially invalid. Instead, LCS claims that the Township has not applied the ordinance neutrally. Specifically, the Township

-15-

has allowed a driver licensing program to operate on the Church property without the
proper permit for over a decade. Outwardly, the Township condemned the Church for
allowing the driver licensing program to continue to operate on its property and even
listed the driver licensing program as one of the reasons for denying the Church's
permit application that would have allowed LCS to operate on the Church property.
(Doc. 4-11, Pg ID 219). The Township did, however, meet with the owners of the driver
licensing program around the time LCS was denied a special use permit and assured
the driver licensing program that it could continue operating on the Church property.
(Doc. 43-7, Pg ID 1310). LCS argues that permitting one secular, educational use while
denying a religious, educational use on the same property is not a neutral application of
the ordinance against LCS, a Christian school.

LCS insists that since at least 1999, the Township has never denied a special
use permit, until now. This cuts both ways. Although, the Township has never denied a
special use permit for a secular use, it has also never denied a special permit for a
religious use. The Township has approved three other special use permits for the
Church, a religious institution. The denial at issue was the first time the Church was
denied a special use permit. The Township's history of granting special use permits for
religious uses casts doubt on LCS's contention that the Township was motivated by a
discriminatory intent. The Church, furthermore, is not just any religious institution, it is a
religious institution with which LCS is affiliated. In addition, the driver licensing program
does not attract the amount of traffic as would a school located on the property. Nor
would the traffic be as consistent. LCS does not present any additional evidence to
suggest that the Township was participating in "religious gerrymandering" or otherwise

-16-

discriminating against LCS as a religious institution. Summary judgment as to this claim is, therefore, GRANTED.

**C. Fourteenth Amendment - Substantive Due Process**

LCS claims that the Township violated its Fourteenth Amendment right to Substantive Due Process by arbitrarily and capriciously denying it a protected property right when the Township denied the requested special use permit. "To state a substantive due process claim in the context of zoning regulations, a plaintiff must establish that (1) a constitutionally protected property or liberty interest exists, and (2) the constitutionally protected interest has been deprived through arbitrary and capricious action." *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 573 (6th Cir. 2008).

*1. LCS Has Standing Even Though It Did Not Apply for the Permit*

As an initial matter, the Township argues that LCS lacks standing because it was the Church, not LCS, that filed for the special use permit. The Township points to what it refers to as a "'long line of cases' in which courts held that a claimant lacks standing to challenge the denial of a permit or another benefit for which the claimant never applied." (Doc. 35, Pg ID 983). The Township argues that, based on these cases, LCS lacks an "injury in fact," which is a requirement of standing. LCS claims that it does have standing and that the court previously said as much in its Opinion and Order Denying Plaintiff's Emergency Motion for Temporary Restraining Order. (Doc. 22, Pg ID 647).

The "injury in fact" requirement "ensures that the plaintiff[] ha[s] a 'personal stake in the outcome of the controversy.'" *Green Party of Tennessee v. Hargett*, 791 F.3d 684, 695-96 (6th Cir. 2015) (citation omitted). This injury must be "concrete and particularized," "actual and imminent," and not "conjectural or "hypothetical." *Susan B.*

*Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

For the most part, the cases cited by the Township are not applicable because the claimants in those cases were only challenging a benefit or policy in the abstract. *See, e.g., Madsen v. Boise State Univ.*, 976 F.2d 1219, 1220-21 (9th Cir. 1992) (also citing a "long line of cases" where plaintiffs merely challenged a benefit or policy in the abstract). Here, however, LCS is not challenging the ordinance in the abstract. The Church applied for the ordinance, and LCS was denied use of the Church property when the Township denied the Church's application. So those cases do not apply. There is, however, one case, *Miller v. Montgomery County*, 458 Fed. Appx. 304 (4th Cir. 2011), which the Township refers to, that is on point. In that Fourth Circuit case, plaintiff entered into a contract with a landowner to harvest timber on the landowner's property. *Id.* at 305. The contract was contingent on plaintiff complying with county regulations regarding timber harvesting. *Id.* In order to harvest timber, the county required permission to ensure that the harvesting was within the "forest management objectives." *Id.* at 306. The county denied the landowner's application, and plaintiff sued for, among other things, violations of the Fourteenth Amendment. *Id.* at 306-07. The district court found that plaintiff did not have standing to bring his claims because he did not have an "injury in fact." *Id.* at 309. The Fourth Circuit agreed with the district court that plaintiff did not have an "injury in fact."

The matter at hand is distinguishable, however. Unlike the contract to harvest timber in *Miller*, which was contingent on the plaintiff receiving an exemption, the lease agreement between LCS and the Church is not contingent on LCS obtaining a special

-18-

use permit. (Doc. 43-4). In addition, LCS prepaid the Church approximately $70,000. It is clear that LCS has a "personal stake in the outcome of the controversy." *Green Party*, 791 F.3d at 695-96 (internal quotation marks omitted). Moreover, the injury to LCS is "concrete and particularized," "actual and imminent," and not "conjectural or hypothetical." *Driehaus*, 134 S.Ct. at 2341 (citing *Lujan*, 504 U.S. at 560). LCS has standing to bring this claim.

### 2. Fourteenth Amendment Claim Is Not Subsumed by First Amendment Claim

The Township also argues that LCS's Fourteenth Amendment Claim is subsumed by its First Amendment Claim, and the court should, therefore, not consider the Fourteenth Amendment Claim. The *Graham* doctrine establishes that, "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a *particular sort of government behavior*, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor,* 490 U.S. 386, 395 (1989)) (emphasis added). This doctrine prevents the expansion of the concept of Substantive Due Process where there is another, more specific constitutional provision that protects against the same government action. *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992) ("[T]he Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended."). "This does not mean, however, that the applicability of the more explicit provision pre-empts due process protections." *John Corp. v. City of Houston*, 214 F.3d 573, 582 (5th Cir. 2000) (citing other cases holding the same).  A Substantive Due Process claim is not

-19-

subsumed if it "addresses a separate injury." *Warren v. City of Athens, Ohio*, 411 F.3d 697, 708 (6th Cir. 2005).

LCS included its First Amendment Free Exercise claim and Fourteenth Amendment Substantive Due Process claim in "Count IV–Violations of Civil Rights and Due Process" of its amended complaint. The Township argues that, based on the *Graham* doctrine, because these are not distinct claims and are based on the same facts, the Fourteenth Amendment Claim is subsumed by the First Amendment Claim, which is more specific. 490 U.S. at 395. LCS's response brief is silent as to this argument. The Township relies on *Guindon v. Twp. of Dundee, Mich.*, 488 F. App'x 27, 38 (6th Cir. 2012) to establish that, once the court has ruled on the First Amendment claim, it "need not address any alleged substantive . . . due process violations." The Sixth Circuit in *Guindon*, however, did not discuss the *Graham* doctrine. Instead, the Sixth Circuit merely agreed with the district court that it need not address the alleged Substantive Due Process violations "because all of these claims are derivative of [Guindons'] claims asserting violations of their individual constitutional rights, and those claims lack merit." *Id.*

While LCS, like Guindon, included its Fourteenth Amendment Substantive Due Process claim and First Amendment Free Exercise claim in the same count, the claims are not derivative of one another. LCS alleges different facts to support these claims. LCS's First Amendment claim is primarily supported by facts contrasting the Township's treatment of LCS with the Township's treatment of the driver licensing program. Whereas, in support of its Fourteenth Amendment claim, LCS alleges facts indicating that the Township Board did not have the authority to deny the Church's permit.

-20-

Additionally, the First Amendment claim is premised on alleged discriminatory treatment by the Township based on LCS's religious belief; whereas the Substantive Due Process claim is premised on an alleged procedural defect. These are separate injuries, and LCS's Substantive Due Process claim should not be subsumed by the First Amendment.

### 3. LCS Has No Protected Property Interest

To demonstrate a violation of Substantive Due Process, LCS must first show that it had a protected property interest in the special use permit. In order for LCS to have a protected property interest, the Township must not have had discretion in deciding whether or not to grant the special use permit. *Silver v. Franklin Twp. Bd. of Zoning Appeals*, 966 F.2d 1031, 1036 (6th Cir. 1992). In other words, LCS must prove that the ordinance at issue required the Township to grant its application for a special use permit and that, by not doing so, the Township violated LCS's protected property interest.

Section 19.02 of the Township's Zoning Ordinance establishes the application and review procedures for special use permits.

19.02.04 **Review.** The request for special land use approval shall be reviewed as follows:

> (a) The special land use request and related documents shall be forwarded to the Planning Commission.

> (b) The Planning Commission shall review the Special Land Use application, the Impact Assessment, and the Site or Sketch Plan in terms of the requirements of the Special Land Use General Review Standards Section 19.03, any specific conditions required for the use and the site plan review standards of Section 18.08.

> (c) The Planning Commission shall hold a public hearing on the special land use application in accordance with the Michigan Zoning Enabling Act (Public Act 110 of 2006).

-21-

Notice of public hearing shall be provided for in accordance with section 21.05. (as amended 12/31/06)

(d) The Planning Commission shall recommend approval, approval with conditions or denial of the Special Land Use Request, Site/Sketch Plan and Impact Assessment to the Township Board.

If the application is determined to be incomplete or more information is required, then the Planning Commission may either: 1) table the request and direct the applicant to prepare additional information or revise the plan; 2) return the request for additional staff review or analysis; or 3) recommend denial of the request. If the plan revisions are determined to be significant by the Planning Commission, they may elect to conduct another public hearing.

(e) For any use requiring special land use approval, the site or sketch plan for such use shall require Township Board approval, based upon a recommendation of the Planning Commission.

(f) Township Board Action: Following receipt of the Planning Commission's recommendation, the Township Board shall take one of the following actions on the Special Land Use, Site/Sketch Plan and Impact Assessment.

(1) Table: If the application is determined to be insufficient, does not fully respond to Planning Commission conditions or more information is required, then the request may be tabled. The Township Board shall direct the applicant to prepare additional information, revise the plan or direct the Township staff or consultant's to conduct additional analysis.

(2) Reconsideration: If the Township Board believes there is new information which might modify the recommendation of the Planning Commission, the Board may return the application with the new information to the Planning Commission for reconsideration.

(3) Approval: Upon determination that a special land use and plan proposal is in compliance with the standards and requirements of this Ordinance and

-22-

other applicable ordinances and laws, the Township
Board shall approve the application.

(4) Conditional Approval: The Township Board may
impose reasonable conditions with the approval of a
special land use, to mitigate impacts associated with
the proposed use or activity to ensure that public
services and facilities affected by a proposed special
land use or activity will be capable of accommodating
increased service and facility loads generated by the
new development; protect the natural environment;
ensure reasonable compatibility with adjacent uses of
land and the overall character of the Township, to the
extent practical for the use; ensure the standards of
this Article and the Zoning Ordinance are met.

(5) Denial of Special Land Use and Site/Sketch Plan
Application: Upon determination that a special land
use or site/sketch plan proposal does not comply with
standards and regulations set forth in this Ordinance,
or requires extensive revision in order to comply with
said standards and regulations, the Township Board
shall deny the application. Resubmittal of an
application which was denied shall be considered a
new application.

According to LCS, Section 19.02 describes a review process whereby the
Planning Commission makes a recommendation to the Township. If the Planning
Commission recommends approval because the ordinance is satisfied, then the
Township "shall" approve the special use permit and "may impose reasonable
conditions with the approval." *Id.* In other words, the Township must rubber stamp the
Planning Commission's decisions. The Township, on the other hand, argues that the
Planning Commission merely makes a "recommendation" to the Township, and a
"recommendation" is, by its nature, non-binding.

Upon review of the statute, it is clear that the Township, not the Planning
Commission, makes the final determination whether or not to grant an application for a

-23-

special use permit. The recommendation the Planning Commission makes to the Township is exactly that, a recommendation. Section 19.02.04 establishes several actions the Township may take once it receives the Planning Commission's recommendation. One of those actions is "Denial of Special Land Use and Site/Sketch Plan Application." The Township chose to deny LCS's application, as it was authorized to pursuant to the ordinance. The Township did have discretion to deny LCS's special use permit, and LCS, therefore, does not have a protected property interest. Because there is no protected property interest, the court does not need to reach the question of whether the Township's denial was arbitrary and capricious. Summary judgment as to this claim in GRANTED.

### III. CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment is GRANTED.

IT IS SO ORDERED.

Dated:  June 30, 2016

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
June 30, 2016, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk

---